**WO**                                                                                                          JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bruce Allison Gamble, | No. CV 12-0790-PHX-GMS (LOA) |
| Plaintiff, | **ORDER** |
| vs. | |
| Joseph M. Arpaio, et al., | |
| Defendants. | |

Plaintiff Bruce Allison Gamble filed this pro se civil rights action under 42 U.S.C. § 1983 against Maricopa County Sheriff Joseph M. Arpaio (Doc. 21). Before the Court are Arpaio's Motion for Summary Judgment (Doc. 63) and Gamble's Motion for Extension, which seeks to extend the October 24, 2013 discovery deadline (Doc. 86).

The Court will grant Arpaio's motion, deny Gamble's motion as moot, and terminate the action.

**I.    Background**

In his Third Amended Complaint, Gamble alleged that, during his confinement at the Maricopa County Sheriff's Office (MCSO) Jail, Arpaio violated Gamble's First Amendment rights by restricting incoming mail to just postcards (Doc. 21 at 3). Gamble claimed that as a result of this policy, he could not receive financial paperwork, e-mails, and other pertinent communications from his business associates relevant to the marketing of his CD "Dream After Dream" (id.).

Arpaio moves for summary judgment on the grounds that (1) the postcard policy did not violate Gamble's First Amendment rights because it is reasonably related to legitimate penological interests and (2) Arpaio is entitled to qualified immunity (Doc. 63).

## II.     Governing Standards

### A.     Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor.  Id. at 255.

### B.     First Amendment

Inmates enjoy a First Amendment right to send and receive mail. Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995). But inmates' First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). A regulation that impinges on an inmate's First Amendment rights is valid if that regulation "'is reasonably related to legitimate penological interests.'" Frost v. Symington, 197 F.3d 348, 354 (9th Cir. 1999) (quoting Turner v. Safley, 482 U.S. 78 (1987)). To determine the validity of a regulation, courts apply the test established under Turner v. Safley, which considers four factors: (1) whether there is a rational connection between the regulation and the asserted governmental interest, (2) whether a prisoner retains alternative means to exercise the right at issue, (3) the impact of any accommodation, and (4) whether there are alternatives for furthering the governmental interest. Turner, 482 U.S. at 89-90.

### C.     Qualified Immunity

Qualified immunity protects government officials from liability for civil damages where a reasonable person would not have known their conduct violated a clearly established right. Anderson v. Creighton, 483 U.S. 635, 638-39 (1987). In determining whether the doctrine of qualified immunity provides a government officer protection, a court must make two inquires: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) whether the constitutional right was well established. Saucier v. Katz, 533 U.S. 194, 201, 121 (2001). Courts have discretion to decide which of the two Saucier prongs to address first depending on the circumstances of the case at hand. Pearson v. Callahan, 555 U.S. 223, 129 (2009).

### III.    Discussion

The Court begins with Arpaio's qualified immunity argument. Given the circumstances in this action, the second Saucier prong—whether the constitutional right at issue was well established—is addressed first.

"A government official's conduct violate[s] clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

- 3 -

1 'reasonable official would have understood that what he is doing violates that right.'" <u>Ashcroft</u>
2 <u>v. al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011) (quoting <u>Creighton</u>, 483 U.S. at 640).  The proper
3 inquiry is whether, at the relevant time, the state of law "gave 'fair warning' to the officials that
4 their conduct was unconstitutional."  <u>Clement v. Gomez</u>, 298 F.3d 898, 906 (9th Cir. 2002)
5 (quoting <u>Saucier</u>, 533 U.S. at 202).  The inquiry must be undertaken in light of the specific
6 context of the particular case.  <u>Saucier</u>, 533 U.S. at 201.  Because qualified immunity is an
7 affirmative defense, the burden of proof initially lies with the official asserting the defense.
8 <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 812 (1982).

9 Arpaio presents undisputed evidence regarding the MCSO postcard policy (Doc. 64,
10 Arpaio's Statement of Facts (DSOF)).  Since 2007, the MCSO Jail policy governing incoming
11 mail has limited all "non-privileged" mail to standard postcards (DSOF ¶¶ 1, 6).  "Non-
12 privileged" mail is any incoming mail that is not privileged, such as mail from family, friends,
13 or third parties, including business mail (<u>id.</u> ¶ 6).  "Privileged" mail is legal correspondence
14 sent from an inmate's attorney of record, and the postcard policy does not relate to or affect
15 in any manner privileged mail sent to inmates (<u>id.</u>).  Under the postcard policy, inmates may
16 receive an unlimited amount of non-privileged mail as long as the communication is in ink on
17 a common postcard with postage in the form of metered postage, i.e., no stamps (<u>id.</u> ¶ 2).
18 Procedures are in place that provide notification to inmates of any rejected mail that does not
19 comply with the postcard policy (<u>id.</u> ¶ 20).  The policy provides that the MCSO may authorize
20 non-postcard items on an individual, case-by-case basis (<u>id.</u> ¶ 1).

21 To support his claim for qualified immunity, Arpaio relies on two prior federal district
22 court decisions in this jurisdiction that named Arpaio as a party and addressed the
23 constitutionality of the MCSO postcard policy (Doc. 63 at 3, 11).  In <u>Gieck v. Arpaio</u>, the
24 inmate-plaintiff attempted a facial challenge to the MCSO postcard policy.  CV 07-1143-
25 PHX-NVW, 2008 WL 2604919, at *1-2 (D. Ariz. June 23, 2008).  The Court analyzed the
26 postcard policy under <u>Turner</u> and determined that each of the four factors weighed in favor of
27 the defendant.  <u>Id.</u>, at *5-7.  Summary judgment was therefore granted to Arpaio.  <u>Id.</u>, at *8.
28 The Court noted, however, that this challenge to the policy fails on its face but that a "real case

- 4 -

with real facts or a different challenge of the context and justification of the mail policy, with supporting evidence, would demand a fresh look." Id.

In Covell v. Arpaio, the inmate-plaintiff alleged that the postcard policy violated his First Amendment rights because it restricted incoming mail to metered postcards and it prevented him from receiving legal mail from witnesses in his criminal case, in which he was representing himself. 662 F. Supp. 2d 1146, 1148 (D. Ariz. 2009). In addressing Arpaio's summary judgment motion, the Court conducted a Turner analysis and again determined that each of the four factors weighed in favor of the defendant. Id. at 1154-55. Accordingly, the postcard policy was found to be reasonably related to legitimate penological objectives. Id. at 1155. The Court further found no evidence that the plaintiff's legal mail from witnesses was improperly rejected and, even if it was, that Arpaio was not responsible for the improper exclusion. Id. at 1155-56. Summary judgment was therefore granted to Arpaio. Id.[1]

Gamble argues that the prior settlement agreement between him and Arpaio in a 2007 federal action, which also challenged the postcard policy, amounts to a victory for him and a loss for Arpaio (Doc. 73 at 7; see CV 07-1141-PHX-GMS). Gamble maintains that this "loss" put Arpaio on notice that the postcard policy is unconstitutional (Doc.73 at 7; Doc. 74, Pl.'s Statement of Facts (PSOF) ¶ 1).[2] But the Court has already found that the prior settlement/release was specific to facts giving rise to the 2007 case and applied solely to "an incident that occurred on or about May 24, 2007" (Doc. 52 at 5, quoting Release). Further,

---

[1] In Prison Legal News v. Columbia Cnty., the Oregon District Court found that a mail policy restricting outgoing and incoming mail to postcards was not rationally related to security interests, and defendant jail officials were enjoined from enforcing the policy. 2012 WL 1936108 (D. Or. May 29, 2012). The Oregon District Court distinguished the facts from those in Covell on the basis that the MCSO jail policy prohibited postage stamps due to the ability to smuggle drugs under stamps, whereas the Oregon jail policy did not prohibit postage stamps. Id., at *9 n. 7. Further, the MCSO policy served to prevent notepad bindings from coming into the jail; such bindings had been found hollowed out to conceal contraband. The defendants in the Oregon case made no similar argument. Id.

[2] Arpaio's objection to PSOF ¶¶ 1b (in part) and 2d are sustained (Doc. 78 at 2, 5). Gamble asserts that in the 2007 case, Arpaio's summary judgment motion and request for qualified immunity were denied (Doc. 74, PSOF ¶¶ 1b, 2d). The docket in CV 07-1141-PHX-GMS shows that Arpaio never moved for summary judgment or made a claim for qualified immunity.

this agreement was between the parties, and the Court made no findings as to the constitutionality of the postcard policy. Therefore, for qualified immunity purposes, the prior settlement/release in no way serves to put Arpaio on notice that his policy would be clearly unlawful.

In the instant action, Gamble challenges that exact same postcard policy that was addressed in Gieck and Covell. See Covell, 662 F. Supp. 2d at *1149; Gieck, 2008 WL 2604919, at *1. Thus, in light of the Gieck and Covell decisions in 2008 and 2009, which applied Turner and specifically held that the postcard policy was constitutional, Arpaio would not have been aware in 2012 that the very same postcard policy was unconstitutional. See Clement, 298 F.3d at 906.

Upon a finding that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity without determining whether the allegations in fact make out a statutory or constitutional violation. Pearson, 555 U.S. at 236-42. Nonetheless, the Court considers Gamble's specific allegations regarding his situation. He explains that while he was detained, a company with which he was working to market his CD sent him a postcard informing him that business communications—such as e-mails and bank statements—from Disney and Chase Bank could not be handled through postcards (Doc. 73 at 2). Gamble avers that he was forced to contact his management team and suspend negotiations on his CD sales (id. at 2-3). He further avers that various businesses and associates had to curb their business activity as a result of the postcard policy (Doc. 74, PSOF ¶ 2[3]). Gamble relies on Procunier v. Martinez, 416 U.S. 396 (1974), to argue that the postcard policy should be judged by a standard that considers the outside party's interest in communicating with the prisoner and balance that against the legitimate and substantial state interest in operating the jail (id., PSOF ¶ 1b).

Procunier was overruled by Thornburgh v. Abbott to the extent that it applies to

---

[3] Arpaio's objection to PSOF ¶ 2 is overruled (Doc. 78 at 3-4). The Court considers a portion of PSOF ¶ 2 to the extent that Gamble alleges that his business associates could not mail him certain correspondence. The remaining objections to PSOF ¶ 2 are not relevant.

incoming mail; thus, Procunier is limited to regulations concerning outgoing correspondence. Thornburgh, 490 U.S. 401, 412-14 (1989) (dealing with incoming publications targeted to a general audience). Even so, in Gieck and Covell, the Court conducted a balancing test that effectively entails the rule set forth in Procunier.[4] In analyzing the Turner factors, the Court noted that the postcard policy is neutral on its face and there was nothing to indicate that the policy sought to suppress expression. Covell, 662 F. Supp. 2d at 1153; Gieck, 2008 WL 2604919, at *5. The prior rulings also recognized that there were alternative means for communication, including telephone calls and jail visits. Covell, 662 F. Supp. 2d at 1154; see Gieck, 2008 WL 2604919, at *6 (right to communicate must be viewed "'expansively,' which gives weight to other effective means"). Both cases concluded that the postcard policy was reasonably related to a legitimate penological interest in reducing contraband smuggling and there were no obvious and feasible alternatives. Covell, 662 F. Supp. 2d at 1153, 1155; Gieck, 2008 WL 2604919, at *6-8.

Here, as he did in the prior cases, Arpaio presents evidence to support the governmental interest of reducing contraband smuggling (Doc. 64, DSOF ¶¶ 8-9, 13). He also demonstrates that Gamble retains the option to communicate though jail visits and telephone calls (id. ¶ 14), and Gamble does not indicate why these options would not serve or partially serve his need to communicate with business associates. Arpaio notes that Gamble could have asked his attorney to send bank notes or business correspondence through legal mail, which is not subject to the postcard limitation (Doc. 77 at 4). And Arpaio submits evidence that under the mail policy, the jail commander may authorize other non-postcard items or packages on a case-by-case basis (Doc. 64, DSOF ¶ 1; Ex. B (Bates No. MCSO-0067), Ex. C (Bates No. MCSO-0061)). Gamble presents no allegation or evidence that he requested the jail commander authorize receipt of non-postcard letters or packages related to his business correspondence

---

[4] The rule established in Procunier provided that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression[,]" and "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413.

or that such a request was denied.

In light of undisputed evidence of alternative options for communicating with business associates, Gamble cannot establish a genuine issue of material fact that the postcard policy violated his First Amendment rights.

For the above reasons, Arpaio's Motion for Summary Judgment will be granted, and Gamble's Motion for Extension will be denied as moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant Arpaio's Motion for Summary Judgment (Doc. 63) and Plaintiff's Gamble's Motion for Extension (Doc. 86).

(2) Defendant Arpaio's Motion for Summary Judgment (Doc. 63) is **granted**.

(3) Plaintiff Gamble's Motion for Extension (Doc. 86) is **denied as moot**.

(4) The Clerk of Court must enter judgment accordingly and terminate the action.

DATED this 4th day of November, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge